UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 10705 / September 27, 2019

INVESTMENT ADVISERS ACT OF 1940
Release No. 5376 / September 27, 2019

INVESTMENT COMPANY ACT OF 1940
Release No. 33649 / September 27, 2019

ADMINISTRATIVE PROCEEDING
File No. 3-15574



In the Matter of

   HARDING ADVISORY LLC and

   WING F. CHAU,

Respondents.

ORDER MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 203(e), 203(f), AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940

I.

On October 18, 2013, the Securities and Exchange Commission ("Commission") instituted public administrative and cease-and-desist proceedings against Harding Advisory LLC ("Harding Advisory" and together with its predecessor, "Harding") and Wing F. Chau ("Chau" and together with Harding, "Respondents") pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act"). After an initial decision had issued in this matter and the Commission issued an Opinion following Respondents' petition for review of the initial decision, Respondents appealed to the United States Court of Appeals for the District of Columbia Circuit, which remanded the case to the Commission for rehearing and the Commission remanded the case to Chief Judge Murray for reassignment to a new administrative law judge ("ALJ")pursuant to the United States Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018).

## II.

Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act, Sections 203(e), 203(f), and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act (the "Order"), as set forth below.

Respondents recognize that, according to *Lucia*, 138 S. Ct. 2044, Respondents are entitled to a "new hearing" before "another ALJ (or the Commission itself)." Respondents knowingly and voluntarily waive any claim or entitlement to such a new hearing before another ALJ or the Commission itself. Respondents also knowingly and voluntarily waive any and all challenges to the administrative proceedings or any and all orders that were issued during or at the conclusion of those proceedings, whether before the ALJ, the Commission, or any court, based upon any alleged or actual defect in the appointment of ALJ Cameron Elliot.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### A. Summary

1. This matter involves violations of Section 206(2) of the Advisers Act and Section 17(a)(2) of the Securities Act by Harding and its principal, Chau, in their role as investment managers for certain collateralized debt obligations ("CDOs") known as Lexington V Capital Funding Ltd. ("Lexington") and Neo CDO 2007-1 ("Neo") (together, the "Issuers" or "CDOs"). As the collateral manager of these CDOs, Harding was responsible for the selection, and monitoring of portfolios of assets – the collateral – backing tranches of securities that the CDOs issued to investors.

2. In conflict with the offering circulars for these CDOs, Harding and Chau negligently breached their obligations to the Issuers by failing to use reasonable care in selecting for inclusion in the portfolios of Neo and Lexington, millions of dollars' worth of BBB-rated notes from a CDO, known as Norma. The Norma BBB-rated notes represented approximately 1.6% of the value of the asset portfolios of each of Lexington and Neo.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

3. Norma was structured by a subsidiary of Merrill Lynch & Co., Inc. (collectively with the subsidiary, "Merrill") pursuant to an agreement with a hedge fund investor, Magnetar Capital LLC ("Magnetar").

4. As a favor to Merrill, from whom Harding obtained substantial CDO business, Harding and Chau selected certain Norma BBB-rated notes without exercising reasonable care, adding the lower-rated notes to their prior Norma commitment of A-rated notes, after receiving pressure from Merrill and a direct request from Magnetar.

5. Harding and Chau acted unreasonably by putting those interests ahead of their obligations to the Issuers and their investors when they selected the Norma BBB-rated notes for placement into the portfolios of the Lexington and Neo CDOs.

6. The Norma notes defaulted on March 10, 2008. Neo defaulted on December 20, 2007. Lexington defaulted on July 23, 2009.

### B. Respondents

7. **Harding Advisory LLC** is a registered investment adviser located in Boca Raton, Florida. Harding's principal and near-100% owner is Chau. Harding was founded in or around July 2006 as the successor to an affiliate of Maxim Group LLC. Harding has advised, as collateral manager or sub-collateral manager, 21 CDOs.

8. **Wing F. Chau**, age 51 and a resident of Boca Raton, Florida, has served since 2006 as Harding's CEO, Managing Member, and Chief Compliance Officer.

### C. Other Relevant Entities

9. **Merrill Lynch, Pierce, Fenner & Smith Incorporated** ("MLPFS"), a registered broker-dealer and investment adviser based in New York, at all relevant times was the principal U.S. broker-dealer subsidiary of Merrill Lynch & Co., Inc. (together with MLPFS, "Merrill"). MLPFS was one of the leading structurers of CDOs between 2005 and 2008.

10. **Magnetar Capital LLC** is a hedge fund manager headquartered in Evanston, Illinois. During 2006 and 2007, Magnetar was involved in creating a series of CDOs with Merrill and other arranging banks.

11. **Norma CDO I Ltd.** was a CDO managed by NIR Capital Management and incorporated in the Cayman Islands that closed on March 1, 2007.

12. **Lexington V Capital Funding Ltd.** was a CDO managed by Harding and incorporated in the Cayman Islands that closed on March 29, 2007.

13. **Neo CDO 2007-1, Ltd.** was a CDO managed by Harding and incorporated in the Cayman Islands that closed on April 5, 2007.

### D. Facts

Background on Managed CDOs and Harding's Role

14.     A CDO is a special-purpose vehicle that issues debt to investors and uses the proceeds to invest in fixed income securities or loans. The CDO's debt is issued in different tranches that feature varying levels of risks and returns. The senior tranche is the highest rated, is first in the priority of repayment, through what is called the CDO's waterfall, and has the lowest risk of default. Because of the lower risk of default and the priority of repayment in the CDO's waterfall, the holders of the senior tranche have lower rates of return. The inverse is true for the lower-rated tranches in the CDO, which have progressively higher rates of return and higher risks of default. Typically, the tranche with the highest rate of return and the highest risk of default (referred to as "equity") is unrated.

15.     A CDO transaction may or may not have a collateral manager. The collateral manager's independent selection of assets was a selling point to potential investors.

16.     As collateral manager, Harding's role was to act as investment adviser for the Issuers, selecting and managing a portfolio. During the warehouse period, Harding selected assets for the portfolio pursuant to a warehouse agreement with the structuring bank and often with any other entity that undertook a risk of loss during the warehouse period.

17.     At closing, when the assets were transferred to the CDO Issuers, Harding would enter into a collateral management agreement ("CMA") with the CDO Issuers, and Harding would recommend to the CDO Issuers that they purchase assets assembled in the warehouse.

18.     In those roles, Harding determined whether a potential asset was appropriate for inclusion in the CDO's portfolio.

19.     The Lexington and Neo CMAs appointed Harding as the Issuers' "investment advisor and manager with respect to the Collateral." The CMAs affirmed that Harding would "take all action required, as Collateral Manager for the Issuer[s], to be taken by it under the Advisers Act" and further specified that the CMAs would not create any fiduciary or other implied duties between Harding and the Issuers. If this final provision is interpreted as limiting Harding's responsibilities as an investment adviser (and not just simply disclaiming additional duties created by the agreement), Section 215 of the Advisers Act voids any contract provision that purports "to waive compliance with any provision of" the Advisers Act or the rules under it.

20.     The collateral for these CDO transactions consisted mostly of credit default swaps referencing subprime residential mortgage-backed securities ("RMBS"), as well as securities of other CDOs backed by RMBS.

Harding and Chau's Relationship with Merrill and Magnetar

21.     Merrill structured and marketed most of the CDOs that Harding managed. Prior to June 2006, all of Harding's management fees were earned from CDOs that Merrill structured, and in the second half of 2006 and 2007, Merrill continued to structure and market many CDOs

for which Harding acted as collateral manager. In total, Harding received approximately $42.5 million in fees from these deals. The vast majority of these fees were earned after the deals closed, over the life of these deals, during the period of time Harding managed the CDOs. If a CDO failed, Harding stopped receiving fees.

22. Magnetar partnered with Merrill to create Norma and other subprime CDOs. Harding was not the collateral manager of Norma; rather, in January 2007 it selected for purchase Norma notes for allocation to other CDOs that it managed. At the time of Harding's Norma selection, Magnetar owned nearly all of the equity tranche in three other CDOs managed by Harding. At the time, Harding managed 15 CDOs.

The Purchase of Norma BBB-Rated Notes

23. In January 2007, Chau, after reviewing information about Norma, agreed to select Norma A-rated notes but at that time did not purchase BBB-rated notes. The Norma A-rated notes are backed by the same collateral as the BBB-rated notes. As to the latter, Chau commented to a Merrill salesperson that the "[t]urbo structure is very weak," meaning that this structural feature of the CDO would not, when it is engaged, redirect a meaningful amount of the CDO's cash flow from the equity investors to mezzanine debt investors to pay down the principal of the mezzanine tranches.

24. Later that month, on January 23, 2007, a Magnetar representative emailed Chau with the subject heading "Pls buy some norma bbb." The email continued, "Stop complaining about turbo. :) Remember who was there for u when u were a little guy." Shortly afterwards, Chau wrote, "Did ML tell u I am in for 40mm single-As in Norma – team player!!!"

25. Also, on January 23, 2007, Merrill's head of CDO syndication ("Syndicate Head") wrote to Chau, "what's your level" – i.e., what coupon rate would make the bond acceptable – "on BBB or BBB- if we can't change the turbo?" Chau responded, "ah-so . . . let me sharpen the pencil," to which the Syndicate Head replied, "sweet."

26. The next day, the Syndicate Head asked Chau if he had "'sharpened your pencil' on norma BBBs yet? or has your citi mezz deal and bbb lists in the street taken up too much of your time? bbb- is done now fyi at 480." Chau replied, "I never forget my true friends."

27. Subsequently, Harding agreed to acquire, at an improved coupon rate, $20 million worth of the Norma BBB-rated notes.

28. On February 1, 2007, when a Merrill sales representative asked Chau if he had heard that Merrill had decreased Harding's allocation of the Norma BBBs from $20 million to $15 million, Chau replied, "Now that's what I'm talking about, the love is in the air."

29. Although Harding's orders for Norma were placed in January 2007, Norma itself did not close, and its securities were not available for purchase, until March 1. Shortly before Norma's close, Chau received a commentary on Norma from one of Harding's analysts with a negative assessment of the Norma portfolio which had bearing on the Norma BBB-rated notes. The commentary noted that "quite a large percentage of deals [i.e., RMBS to which the Norma portfolio was exposed] raised red flags."

30. Without sufficient regard for the interests of Harding's and Chau's advisory clients – Lexington and Neo – Chau acceded to Merrill's request that Harding purchase Norma BBB-rated notes. Harding selected $10 million of the BBB-rated notes for the Lexington portfolio and $5 million for the Neo portfolio.

31. In addition to the fiduciary duty Harding and Chau owed Lexington and Neo, the offering circulars and CMAs for the two CDOs executed by Chau represented that Harding, in selecting collateral for the CDOs, would perform its obligations as collateral manager "with reasonable care," using a degree of skill and attention that it would exercise with respect to comparable assets that it managed for itself and "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing relating to assets of [like] nature and character."

32. Although the BBB-rated notes met all of the eligibility criteria for the Lexington and Neo collateral, as defined in the offering documents, Chau acceded to Merrill's request that Harding select for purchase the Norma BBB-rated notes without reasonable analysis of the BBB-rated notes.

33. A reasonable person on behalf of whom Chau and Harding managed assets would have wanted to know that Harding and Chau selected the Norma BBB-rated notes in response to pressure from Merrill.

34. Harding and Chau obtained fees as a result of the statements made in the CMAs and repeated in the offering circulars which were rendered untrue by their conduct.

35. Norma eventually defaulted on the BBB-rated bonds that Harding allocated to Lexington and Neo.

E. **Violations**

36. As a result of the conduct described above, Respondents willfully violated[2] Section 206(2) of the Advisers Act and Section 17(a)(2) of the Securities Act.[3]

---

[2] "Willfully," for purposes of imposing relief under Section 203(e) and 203(f) of the Advisers Act and Section 9(b) of the Investment Company Act, "'means no more than that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard. 922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

[3] Proof of scienter is not required to establish violations of Section 17(a)(2) of the Securities Act or Section 206(2) of the Advisers Act; a violation may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 695–96 (1980); *Steadman v. SEC*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Sections 203(e), 203(f), and 203(k) of the Advisers Act and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A. Respondents Harding and Chau cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act and Section 17(a) (2) of the Securities Act.

B. Respondent Chau be, and hereby is:

Barred from association with any investment adviser; and

Prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such adviser, depositor, or principal underwriter;

with a right to apply for reentry after one (1) year to the appropriate self-regulatory organization, or if there is none, to the Commission.

C. Any reapplication for association by Respondent Chau will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against the Respondent Chau, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award against Respondent Chau related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer of respondent Chau, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization against Respondent Chau, whether or not related to the conduct that served as the basis for the Commission order.

D. Respondents Harding and Chau shall, within ten (10) days of the entry of this Order, pay, jointly and severally, disgorgement of $95,490 to the Securities and Exchange Commission.

E. Respondent Harding shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $850,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C § 3717.

F. Respondent Chau shall pay a civil money penalty of $90,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). Respondent shall pay $45,000 within (10) days of the Order's

issuance and the remainder in equal monthly payments of $5,000 over the course of (9) months. If full payment is not made within the (9) month period, additional interest shall accrue pursuant to 31 U.S.C § 3717. If Respondent fails to make any monthly payment and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

      G.      Payments to the Commission must be made in one of the following ways:

            (1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

            (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

            (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Harding or Chau as a Respondent in these proceedings and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Daniel Michael, Chief, Complex Financial Instruments Unit, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, NY, 10281.

      H.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents Harding and Chau, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Harding or Chau under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Harding and Chau of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary